**DAIRYLEA COOPERATIVE, INC.**

v.

**The UNITED STATES.**

No. 431–74.

United States Court of Claims.

May 12, 1976.

John M. Freyer, Syracuse, N. Y., attorney of record for plaintiff. Bond, Schoeneck & King and James P. McDonald, Syracuse, N. Y., of counsel.

Marc J. Fink, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

Before COWEN, Chief Judge, and SKELTON and KASHIWA, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge.

This case involves the interpretation of a contract for the sale of butter. The plaintiff, Dairylea Cooperative, Inc. (Dairylea) is a farming cooperative in the business of manufacturing and selling commodities commercially and to the Government. In response to announcement LD–Da–3 of the Commodity Credit Corporation (CCC), "Purchase of Dairy Products," plaintiff offered to sell to the CCC some 214,151 pounds of grade AA butter in freezer space at the Hygeia warehouse in Elmira, New York, on June 16, 1972. The offer stated that warehouse charges on the butter were paid through June 20, 1972. The contracting officer of the Minneapolis Commodity Office, by night letter dated June 19, 1972, accepted plaintiff's offer as follows:

> SUBJECT TERMS ANNOUNCEMENT LD–DA–3 CCC ACCEPTS YOUR BUTTER OFFER OF JUNE 16 1972 FOR 214,151 POUNDS AT 68.332 CENTS PER POUND. CONTRACT MP (FF) 51465.

On June 21, 1972, copies one and two of the Notice to Deliver, Form MP–269, along with Form MP–277, Notice to Deliver and Transmittal and Instructions, were mailed

to the plaintiff. Dairylea received this material at its offices in Syracuse, New York, two days later. Form MP–277 provided that for the transfer of title in-store, the vendor should "advise warehouseman of the total number of units and the applicable ex-lots for each grading certificate." The CCC also mailed on June 21, 1972, copies five, six, seven, and eight of Form MP–269A, Forwarding Notices, to the Hygeia warehouse in Elmira, New York. At the bottom of these copies of the form was a nonnegotiable warehouse or consignee receipt. The butter was contaminated by flood waters from Hurricane Agnes on June 23, 1972, before the warehouse ever received its copies of the Forwarding Notices. Hygeia did not receive this material until June 27 or 28, 1972. The butter was condemned by New York authorities and was destroyed.

The transfer of title to CCC was not executed, and on June 30, 1972, a representative of CCC visited the warehouse and instructed the warehouseman not to execute the transfer of title. Thereafter, CCC terminated the contract for failure to deliver the butter in accordance with the provisions of announcement LD–Da–3. Plaintiff appealed CCC's failure to pay for the butter to the contracting officer on August 21, 1972. The contracting officer concluded in his decision that CCC was not liable for the contract price of the butter because it was never delivered to CCC under the terms of the contract.

The plaintiff filed an appeal from the decision of the contracting officer with the Board of Contract Appeals of the Department of Agriculture (Board) by letter dated September 6, 1972, pursuant to the disputes clause of the Uniform Contractual Provisions (ASCS–101 Article 25), which was a part of the contract. A hearing was held before the Board on October 23, 1973, in which both parties participated and were represented by counsel. The Board's decision of August 16, 1974, denied Dairylea's appeal and claim for the contract price on the ground that the risk of loss had not passed to the CCC prior to June 23, 1972,

the date on which the butter was contaminated.

The plaintiff filed suit in this court on December 16, 1974, alleging that the Board had improperly construed the provisions of the contract, especially the provisions pertaining to delivery and shifting of risk of loss. The plaintiff alleges further that the decision of the Board involves only a question of law involving the interpretation of the contract, and, therefore, is not entitled to finality under Section 2 of the Wunderlich Act (41 U.S.C. § 322 (1970)). The plaintiff seeks recovery of the contract price of $146,333.67 solely under Section 2 of that Act.

The case is before us on cross-motions for summary judgment.

The issue here presented is simply when did risk of loss pass, if at all. The contract provisions involved are as follows:

*Announcement LD–Da–3*

\*     \*     \*     \*     \*     \*

II. Submission of Offers
A. \* \* \* Each offer must state:

\*     \*     \*     \*     \*     \*

5. If product is located in CCC-approved warehouse:

\*     \*     \*     \*     \*     \*

c. Date through which storage has been paid.

\*     \*     \*     \*     \*     \*

IV. Acceptance of Offers
Acceptance of offers will be by prepaid telegram filed within two business days following the day offer is received. The date of acceptance shall be the contract date.

V. Documents Constituting Contract
The offer, the acceptance, this Announcement and the "Uniform Contractual Provisions", Form ASCS–101 (10–1–68), except Articles 5, 6, 7, 9, 11 (except 11 b is retained), 12, 16, 17, 19, 20, 30, 33, 34, and all Articles of Part IV, shall constitute the contract.

\*     \*     \*     \*     \*     \*

VIII.   Location At Time of Sampling and Offer

\*   \*   \*   \*   \*   \*

B.   *Butter.* Butter shall be located either in a CCC-approved warehouse for the storage of butter, Seller's manufacturing plant, or at an assembler's facility at the time of sampling and offering for sale to CCC. The butter shall remain in the location where sampled until delivered to CCC. Butter sampled and offered for sale which is in a CCC-approved warehouse may be in either cooler or freezer space.

\*   \*   \*   \*   \*   \*

XII.   Delivery

The Minneapolis ASCS Commodity Office will issue a Notice to Deliver within seven business days after date of acceptance. of offer. Seller shall deliver product as directed, within seven business days after receipt of instructions. Such delivery shall be directed by CCC in accordance with one of the following provisions:

A.   *CCC-Approved Warehouse.*

\*   \*   \*   \*   \*   \*

2. If butter at the time it is offered for sale to CCC is in a warehouse approved by CCC for the storage of butter, it may be located either in cooler or freezer space, with delivery as follows:

\*   \*   \*   \*   \*   \*

b. If butter is offered for sale to CCC in freezer space, Seller will be required to make delivery (1) in-store in such freezer space with in-and-out handling charges and storage charges through date of delivery paid by the Seller, or (2) at CCC option F.O.B. cars or trucks, in which event Seller shall pay all necessary dunnage and bracing charges.

\*   \*   \*   \*   \*   \*

C.   *Date of Delivery. The date of delivery shall be the date of shipment by carrier* (except as noted for dairy products transported by Seller's own truck or contract carrier), *date of issuance of warehouse receipt acceptable to CCC, or date of acknowledgement of receipt of the product by CCC, whichever is applicable.*
*Title to the product and risk of loss shall pass to CCC upon delivery.* [Emphasis supplied.]

\*   \*   \*   \*   \*   \*

XIV.   Storage Charges

For product delivered to CCC in a CCC-approved warehouse, (which in the case of butter must be in freezer space), Seller shall pay directly to the warehouseman all storage charges through the date of delivery to CCC, including in-and-out handling charges. Prepaid storage remaining on any lot at the time of delivery shall accrue to the benefit of CCC.

\*   \*   \*   \*   \*   \*

As shown above, Section XII C. of Announcement LD–Da–3 provides that the date of delivery shall be on one of three dates—date of shipment by carrier; date of issuance of a warehouse receipt acceptable to CCC; or date of acknowledgment of receipt of the product by CCC, "whichever is applicable." The same section provides further that "title to the product and risk of loss shall pass to CCC upon delivery." This provision of the contract between the parties is clear and unambiguous. Title was to be transferred in-store, so the issuance of the warehouse receipt was the applicable event for establishing the date of delivery. Contrary to the plaintiff's contention, the issuance of the receipt was more than a mere "ministerial" act. Obviously, the date of delivery could not be the date of shipment by carrier, for CCC was to take title in-store. Neither was the date of acknowledgment of the receipt of the product applicable, for no shipment was involved. Therefore, it must follow that the date of issuance of the warehouse receipt was to be the date of delivery. In very clear and precise terms, the parties agreed how the delivery date would be set and when risk of loss should pass to the buyer. We conclude that since the warehouse receipt was never issued, the risk of loss did

not pass to CCC, but remained with Dairylea.

The contract was not ambiguous. The date of delivery was plainly fixed, as noted above. Delivery would occur only when Hygeia executed an acceptable warehouse receipt. Plaintiff claims that Sections II A.5.c. and XII A.2.b. of the contract equate delivery with the date through which storage charges were paid by Dairylea, namely June 20, 1972. These contract provisions have separate and distinct functions, other than date of delivery. Section XII A.2.b. was intended to give the CCC the option to decide, within seven days after acceptance of the plaintiff's offer, whether to take delivery in-store or to have the butter shipped elsewhere. The decision was to be made known to Dairylea and Hygeia by a Notice of Delivery sent to both of them by CCC. The section says nothing about how the date of delivery would be fixed, but only that the seller was required to pay storage charges through the delivery date, if delivery was to be taken in-store.

Section II A.5.c. was included for the purpose of enabling CCC to get the benefit of any prepaid storage charges paid by the seller. In the event that delivery took place before the date through which charges have been paid by the seller, CCC would receive a period of "free" storage. The date the warehouse receipt was executed would mark the beginning of CCC's liability for storage charges, assuming that prepaid storage charges did not go beyond that date. For example, if there had been no flood in Elmira on June 23 and Hygeia had executed the warehouse receipt on that date, it would have expected CCC to pay storage charges beginning June 23. Since Dairylea had paid for storage only until June 20, Hygeia could have recovered three days storage charges from Dairylea. These arrangements indicating how storage charges were to be paid do not render section XII C. as to date of delivery ambiguous.

Next, plaintiff contends that CCC had full control over the butter prior to the execution of the warehouse receipts, and that therefore section XII C. is rendered meaningless. We do not agree. In addition to the provisions of the contract and other facts, the testimony of Mr. Bullard, Manager of Dairylea, before the Board is significant. When asked if the butter was under Dairylea's control while it was in the warehouse, he answered unequivocally "yes."

The interpretation of the contract by the Board was correct. While we sympathize with Dairylea on having to bear the substantial loss of the butter due to an act of God (the storm), we see no legal way to shift the loss to the Government.

We hold that the butter was never delivered to the CCC by the execution of a warehouse receipt by Hygeia as required by the contract, and by reason thereof the risk of loss remained with Dairylea, the owner of the butter, and, consequently, Dairylea must bear the loss and is not entitled to recover the contract price of the butter from the Government in this case.

Plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and plaintiff's petition is dismissed.